UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERIC LIPTON, et al.,

    Plaintiffs,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

    Defendant.

Civil No. 17-2588 (JDB)

## MEMORANDUM OPINION

The world moves fast, but government bureaucracy does not. Officials meet daily with individuals and groups that attempt to sway their thinking on the issues of the moment. But while the buttering-up and sausage-making takes place in real time, citizens may only discover what their officials are up to if they ask—and then sue. The Freedom of Information Act (FOIA) requires disclosure of records, such as calendar entries, upon request. Yet agencies may take months to respond, and an incomplete or delayed answer can mean months longer in court. Requesters therefore fear that by the time they can wrest the desired information from an agency's hands, it will be too late for that information to be useful.

The New York Times and one of its reporters, Eric Lipton, believe they have found a way to cut this Gordian knot. One section of FOIA, known as the "reading-room provision," requires agencies proactively to publish certain materials on their websites. Among other things, agencies must make publicly available any previously-released records that either already have been sought at least three times or are likely to be the subject of further requests. See 5 U.S.C. § 552(a)(2)(D). Lipton and the Times (hereinafter "plaintiffs") wish to use this provision to obtain from the Environmental Protection Agency (EPA), on a rolling basis, the detailed daily calendar of former

1

Administrator Scott Pruitt's activities. EPA counters that the reading-room provision cannot guarantee plaintiffs access to calendar entries that have not yet been, and may never be, created. As the government has the better of this statutory interpretation debate, partial summary judgment will be entered for EPA on Claim One of plaintiffs' complaint.

## BACKGROUND[1]

FOIA consists of both proactive and reactive provisions. The reactive provision of FOIA mandates that agencies disclose most records upon request. See 5 U.S.C. § 552(a)(3). Section 552(a)(3) is "the [A]ct's most familiar provision," Citizens for Responsibility & Ethics in Wash. (CREW) v. DOJ, 846 F.3d 1235, 1240 (D.C. Cir. 2017), under which most FOIA litigation takes place. But the Act also requires agencies affirmatively to publish certain information about themselves, as well as all their substantive rules and all final opinions or orders resolving agency adjudications. See Pub. L. No. 89-554, § 552(b)–(c), 89th Cong. (1966), 80 Stat. 378, 383 (codified as amended at 5 U.S.C. § 552(a)(1)–(2)). This proactive section is often referred to as FOIA's "reading-room provision." See CREW, 846 F.3d at 1240.

In 1996 and 2016, Congress amended FOIA to bring it up to date with the digital age. See Electronic Freedom of Information Act Amendments of 1996 ("1996 Amendments"), Pub. L. No. 104-231, 104th Cong., 110 Stat. 3048; FOIA Improvement Act of 2016 ("2016 Amendments"), Pub. L. No. 114-185, 114th Cong., 130 Stat. 538. The 1996 Amendments added to the reading-room provision a requirement that agencies publish electronically copies of any records that already have been released under the reactive provision of FOIA and that have attracted or likely will attract more such requests. See 1996 Amendments, § 4, 110 Stat. at 3049 (codified as

---

[1] There are no disputes regarding any of the material facts necessary to the resolution of these cross-motions. See Pls.' Statement of Material Facts [ECF No. 20-2] ¶¶ 33–36; Def.'s Statement of Material Facts [ECF No. 23-1] ¶¶ 1–9; Def.'s Response to Pls.' "Statement of Material Facts" [ECF No. 23-2] ¶¶ 33–36; Pls.' Response to Def.'s Statement of Material Facts [ECF No. 27-1] ¶¶ 1–9.

amended at 5 U.S.C. § 552(a)(2)(D)). The 2016 Amendments rewrote the provision so that it also applies to records that previously have been released and that have been requested at least three times. See 2016 Amendments, § 2, 130 Stat. at 538 (codified at 5 U.S.C. § 552(a)(2)(D)).

Plaintiff Eric Lipton is an investigative reporter at the New York Times. Lipton Decl. [ECF No. 20-7] ¶ 1. He has published a number of articles reporting on conflicts of interest involving former EPA Administrator Scott Pruitt and other EPA officials, and relies on FOIA requests for his ongoing reporting on the topic. Id. ¶¶ 3, 6–7. On July 12, 2017, Lipton and the Times filed a FOIA request with EPA, seeking Pruitt's daily schedule, with full details of his meetings, from April 1, 2017 through the date of the request. See July 12, 2017 FOIA Request Confirmation [ECF No. 20-4, Ex. A]. On October 19, 2017, plaintiffs updated their request, asking not only for Pruitt's detailed calendar through the date of EPA's search but also "that Administrator Pruitt's daily schedule . . . be made available for public inspection in an electronic format" and "that the record be regularly updated throughout [his] time as a federal employee." Langford Decl. [ECF No. 20-3] ¶ 6; see Oct. 19, 2017 FOIA Request [ECF No. 20-4, Ex. C] at 1.

EPA failed to respond to plaintiffs' revised request within FOIA's twenty-day deadline, and on December 4, 2017, plaintiffs filed this suit against EPA. See Compl. [ECF No. 1]. Plaintiffs bring two claims. Claim One alleges that EPA's failure to make the Administrator's calendar available on a regularly updated basis throughout Pruitt's tenure violated § 552(a)(2)(D). Id. ¶¶ 23–24. Claim Two alleges that EPA violated FOIA by failing timely to respond to plaintiffs' request under the reactive provision. Id. ¶¶ 25–26. They seek a declaratory injunction that the detailed calendar they seek is a public record which must be published in an electronic format under § 552(a)(2)(D), an injunction ordering EPA to process and release regular updates of the Administrator's calendar, and orders related to the alleged violation of the reactive provision. See

3

id. Prayer for Relief ¶¶ 1–7. Plaintiffs later requested, and the Court granted, a schedule that split plaintiffs' claims into two rounds of briefing. See Scheduling Order [ECF No. 19]. The parties filed cross-motions for summary judgment on Claim One, regarding the reading-room provision. See Mem. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") [ECF No. 20-1]; Def.'s Cross-Mot. for Partial Summ. J. ("Def.'s Mot.") [ECF No. 23]. Each party has responded to the other's motion, rendering Claim One ripe for decision. See Mem. in Opp'n to Def.'s Cross-Mot. ("Pls.' Reply") [ECF No. 27]; Def.'s Reply to Pls.' Opp'n ("Def.'s Reply") [ECF No. 30].

## LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment." Georgacarakos v. FBI, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" which it believes demonstrate the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); see Celotex, 477 U.S. at 323.

## ANALYSIS

Plaintiffs assert that EPA's failure to make the Administrator's detailed calendar available in its electronic reading room on an ongoing basis violates FOIA's reading-room provision. See Pls.' Mot. at 9. They urge that the calendar meets all of the prerequisites for publication under

4

§ 552(a)(2)(D): EPA has already released certain date ranges of the calendar, the calendar is of significant public interest and is likely to be the subject of future requests, and it has already been the subject of three or more FOIA requests. See id. EPA responds that plaintiffs "have fundamentally misread section 552(a)(2)(D)," which EPA asserts "cannot, by its terms, apply to future calendar records, or indeed to any categorical type of future records that the agency may or may not produce." Gov't Mot. at 8–9. As EPA reads the statute, § 552(a)(2)(D)'s requirement that a document be released under the reactive provision before the section is triggered dooms plaintiffs' claim, as one cannot make a proper FOIA request for documents that do not yet exist. See id. To resolve plaintiffs' claim, then, the Court must determine whether the Administrator's detailed calendar—including both existing and future entries—constitutes a single "agency record" which must be continuously published under the reading-room provision.

Two initial observations. First, for the purposes of this opinion, the Court assumes without deciding that the Administrator's detailed electronic calendar up through the date of plaintiffs' FOIA request is an "agency record" (or "records"). See Consumer Fed'n of Am. v. Dep't of Agric., 455 F.3d 283, 293 (D.C. Cir. 2006) (finding that electronic calendars were records subject to FOIA when they were broadly distributed within the agency and other employees at the agency used and relied on them). Second, as "FOIA's terms apply government-wide," the Court will "decline to accord deference to agency interpretations of the statute, as [it] would otherwise do under" the Chevron doctrine. Al-Fayed v. CIA, 254 F.3d 300, 307 (D.C. Cir. 2001).

Ultimately, however, the Court finds that EPA's proffered interpretation is correct. The reading-room provision does not enable plaintiffs to seek all future entries in the Administrator's detailed calendar on a rolling basis; it only requires an agency to make publicly available documents that have already been created, requested, and released in the past. This "conclusion

5

rests in large part upon the statute's wording, both its individual words and the text taken as a whole." Lagos v. United States, 138 S. Ct. 1684, 1688 (2018).  Statutory and legislative history also provide "corroborating evidence," Tapia v. United States, 564 U.S. 319, 331–32 (2011), as does relevant case law.

First, the text.  The pertinent portion of the reading-room provision reads as follows:

> Each agency, in accordance with published rules, shall make available for public inspection in an electronic format—
> . . .
> **(D)** copies of all records, regardless of form or format—
> **(i)** that have been released to any person under paragraph (3); and
> **(ii)(I)** that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or
> **(II)** that have been requested 3 or more times . . . .

5 U.S.C. § 552(a)(2)(D).  The statutory text clearly contemplates that only extant information, and not information that an agency may create in the future, needs to be published.

Start with the operative word: "record."  The Court must first examine any statutory definition of this word, for "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." Stenberg v. Carhart, 530 U.S. 914, 942 (2000).  However, the statute is unhelpful here.  "[W]hile FOIA 'limited access to "agency records,"' it 'did not provide any definition of "agency records."'" Judicial Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 215–16 (D.C. Cir. 2013) (quoting Forsham v. Harris, 445 U.S. 169, 178 (1980)).  The law only specifies that "'record' and any other term used in [FOIA] in reference to information includes . . . any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format."  5 U.S.C. § 552(f)(2)(A).  This otherwise tautological statement merely clarifies that electronic, as well as paper, documents count as records.  It does not define what a record is.

Therefore, the Court must "interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" Wis. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2070 (2018) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). And the ordinary understanding has long been that a "record" is an existing document or other permanent, preserved account of past events. This was equally so in 1966, when FOIA itself became law,[2] and in 1996 and 2016, when FOIA was amended to include § 552(a)(2)(D).[3] Common usage, and common sense, supports the government's interpretation of the term "record."

Reading both § 552(a)(2)(D) and FOIA as a whole further clarifies that the Administrator's detailed calendar is not a single, continuous "record" that must be produced in perpetuity under the reading-room provision. To qualify for publication under that provision, records must first "have been released to any person" under the more familiar, reactive FOIA provision. 5 U.S.C. § 552(a)(2)(D)(i). If the other prerequisites in the reading-room provision are fulfilled, the agency must publish "copies" of those same records. Id. § 552(a)(2)(D). And one of the two ways in which those prerequisites can be met is if records are released under the reactive provision "that have been requested 3 or more times." Id. § 552(a)(2)(D)(ii). Thus, § 552(a)(2)(D) equates the

---

[2] See, e.g., Black's Law Dictionary 1437 (rev. 4th ed. 1968) ("A written account of some act, transaction, or instrument, drawn up, under authority of law, by a proper officer, and designed to remain as a memorial or permanent evidence of the matters to which it relates."); Webster's Third New International Dictionary 1898 (1966) ("1 a: the state or fact of being recorded . . . c (1): evidence, knowledge, or information remaining in permanent form (as a relic, inscription, document) . . . (2): an account in writing or print (as in a document) or in some other permanent form (as on a monument) intended to perpetuate a knowledge of acts or events . . . .").

[3] See, e.g., Black's Law Dictionary 1279 (7th ed. 1999) ("A documentary account of past events, usu. designed to memorialize those events; information that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceivable form."); Oxford English Dictionary Online (3d ed. 2009), http://www.oed.com/view/Entry/159867 (fourth definition) ("Anything preserving information and constituting a piece of evidence about past events; esp. an account kept in writing or some other permanent form; (also) a document, monument, etc., on which such an account is inscribed. Frequently in plural: a collection of such accounts, documents, etc."); Webster's Third New International Dictionary 1898 (1993) ("1 a: the state or fact of being recorded . . . c (1): evidence, knowledge, or information remaining in permanent form (as a relic, inscription, document) . . . (2): an account in writing or print (as in a document) or in some other permanent form (as on a monument) intended to perpetuate a knowledge of acts or events . . . .").

"records" that must be published under the reading-room provision with the "records" that have been successfully requested under the reactive provision.[4]  This language suggests that the particular information that must be published under the reading-room provision has to be the same information that has already been released in the past.  See PETA, Inc. v. U.S. Dep't of Agric., 285 F. Supp. 3d 307, 315 n.5 (D.D.C. 2018), appeal docketed, No. 18-5074 (D.C. Cir. Mar. 21, 2018).  One cannot previously have released information, or have copies of information, that has not yet been created.  Nor is nonexistent information likely to have been requested three times.

This reading of the statute is confirmed by the requirement that an agency "search" for the records requested under the reactive provision.  Id. § 552(a)(3)(C).  FOIA specifies that the agency "review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request."  Id. § 552(a)(3)(D) (emphasis added).  Thus, records must already exist at the time of a search to be eligible for release under § 552(a)(3).  Likewise, EPA's published rule for handling reactive FOIA requests notes—in concert with FOIA's definition of a "search"—that "an office will ordinarily include only those records in its possession as of the date the request was received."  40 C.F.R. § 2.103(a).  Since a record must have been released under § 552(a)(3) to qualify for publication under the reading-room provision, information not yet generated at the time of the search is not subject to the reading-room provision.

---

[4] The other way to meet the prerequisites is to successfully request records "that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records."  5 U.S.C. § 552(a)(2)(D)(ii)(I).  Under this subsection of the reading-room provision, the agency's duty to publish stems from the likelihood of requests not for the exact same records that had been released under the reactive provision, but only for "substantially the same records."  Nothing about this language, however, changes the fact that the "record" whose release triggers the agency's determination under this subsection must consist of extant information.  Furthermore, as EPA points out, see EPA Cross-Mot. at 11 n.2, FOIA leaves to the agency's discretion the question whether a record will be the subject of subsequent requests.  Assuming for the sake of argument that this discretion is subject to arbitrary and capricious review, see Pls.' Mot. at 12 (citing 5 U.S.C. § 706(2)(A)), there is a "rational connection between" EPA's factual finding that plaintiffs were seeking records that did not exist and its judgment that there would not likely be subsequent requests for substantially the same, nonexistent, records, Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citation omitted).

Legislative history confirms what the text suggests. See Dig. Realty Tr., Inc. v. Somers, 138 S. Ct. 767, 783 (2018) (Sotomayor, J., concurring) ("[E]ven when, as here, a statute's meaning can clearly be discerned from its text, consulting reliable legislative history can still be useful, as it enables us to corroborate and fortify our understanding of the text."). To begin with, the history indicates that the addition of § 552(a)(2)(D) did not render currently nonexistent information subject to mandatory publication. Congress added a definition of "record" in the 1996 Amendments—but, as the text of FOIA implies, this was done only to "make[] clear a comprehensive policy that records in electronic formats are agency records subject to the Act." H.R. Rep. No. 104-795, at 19 (1996), as reprinted in 1996 U.S.C.C.A.N. 3448, 3462. The definition did not create a new substantive definition of what a record is.[5] Thus, while the reading-room provision broadened the audience to which agencies must disclose certain records, "matter not previously subject to FOIA when maintained in a non-electronic format [was] not made subject to FOIA by" the 1996 Amendments. Id.; see 142 Cong. Rec. S10894, 104th Cong. (1996) (statement of Sen. Leahy) ("[T]he bill would encourage agencies to increase on-line access to government records that agencies currently put in their public reading rooms." (emphasis added)).

Indeed, in the House report on the 1996 Amendments, Congress noted its understanding that "FOIA establishes a presumptive right for the public to obtain identifiable, existing records of Federal departments and agencies." H.R. Rep. No. 104-795, at 6, 1996 U.S.C.C.A.N. at 3449 (emphasis added). This understanding would not appear to bring within FOIA's reach

---

[5] The Senate version of the 1996 Amendments would have provided such a definition, stating that "the term 'record' means all books, papers, maps, photographs, machine-readable materials, or other information or documentary materials, regardless of physical form or characteristics." S. Rep. No. 104-272, at 4 (1996). However, the Senate ultimately passed a version of the House bill with negotiated modifications, see 142 Cong. S10894, 104th Cong. (1996), which did not include the definitional language from the initial Senate bill, see 1996 Amendments, § 3, 110 Stat. at 3049. The House noted that it had rejected the Senate's definition because the definition was pulled from the Records Disposal Act, and courts had read that law's disclosure exclusions (e.g., for "library materials") so broadly as to place documents beyond FOIA's reach. See H.R. Rep. No. 104-795, at 20, 1996 U.S.C.C.A.N. at 3463.

9

hypothetical, yet-to-be-generated information. Moreover, Congress clarified that "the term 'record'" is meant to be "interchangeable" with other terms used in FOIA, such as "'information' and 'matter.'" Id. at 19, 1996 U.S.C.C.A.N. at 3462. It makes little linguistic sense to refer to a document that might be created in the future as constituting the same "information" or "matter" as an already-existing one, no matter how similar the two may prove to be.

Confirming the clear contemplation of the statutory text, the committee reports on the 1996 and 2016 Amendments repeatedly express Congress's assumption that § 552(a)(2)(D) requires publication only of information that is already in the government's hands when the triggering request is made under the reactive provision. These reports constitute "the authoritative source for finding the Legislature's intent" in passing § 552(a)(2)(D), Garcia v. United States, 469 U.S. 70, 76 (1984), and therefore deserve close attention. Both the House and Senate reports on the 1996 Amendments state that § 552(a)(2)(D) was designed to reduce duplicative FOIA requests for the same documents, and thereby lessen agency workloads. See H.R. Rep. No. 104-795, at 21, 1996 U.S.C.C.A.N. at 3464 (stating that § 552(a)(2)(D) "would help to reduce the number of multiple FOIA requests for the same records requiring separate agency responses"); S. Rep. No. 104-272, at 13 (stating that § 552(a)(2)(D) "would reduce the number of duplicative FOIA requests for the same records requiring separate agency responses"). Plaintiffs' interpretation of the reading-room provision, however, would extend its reach to situations like this one in which different groups request information from different date ranges, which do not constitute requests for the "same" records. It also could require agencies to continue releasing an official's calendar in perpetuity, after only three requests for even a small number of calendar entries. This would only increase, not alleviate, agencies' workloads.

The committee reports also provided examples of the sort of "previously-released records on a popular topic" that Congress believed would now become subject to the reading-room provision. H.R. Rep. No. 104-795, at 21, 1996 U.S.C.C.A.N. at 3464. These examples refer to publication of extant documents regarding past events, rather than to rolling disclosures of future documents triggered by prior requests for existing ones. See id. ("[C]opies of previously-released records on a popular topic, such as the assassinations of public figures, would subsequently be treated as (a)(2) materials, made available for public inspection and copying."); S. Rep. No. 104-272, at 13 ("[C]opies of records released in response to FOIA requests on a subject of popular interest, such as the assassinations of Martin Luther King, Jr., and President Kennedy, or on human radiation experiments conducted by the Government, must subsequently be treated as materials subject to release . . . .").[6]

The legislative history of the 2016 Amendments provides plaintiffs no more comfort. The 2016 Amendments added the three-request prong to § 552(a)(2)(D). The Senate report described this provision "as requiring the public posting of documents that have been released under FOIA on three or more occasions." S. Rep. No. 114-4, at 4 (2016), 2016 U.S.C.C.A.N. 321, 324. Thus, far from changing what constitutes a record for purposes of the reading-room provision, the 2016 Amendments merely "clarif[y] that" the provision applies to "any document that has been released under FOIA and has been requested three or more times." Id. at 7, 2016 U.S.C.C.A.N. at 327. Legislative history therefore corroborates the most sensible reading of the text.

---

[6] The House bill, rather than the Senate bill, formed the basis for the final law. See supra note 5. However, the language of what would become § 552(a)(2)(D) was nearly identical in both bills, except that the House bill explicitly required a record previously to have been released under § 552(a)(3) to be eligible for publication under § 552(a)(2)(D). See H.R. 3802, 104th Cong. § 4 (as reported by H. Comm. on the Judiciary, July 25, 1996); S. 1090, 104th Cong. § 4 (as reported by S. Comm. on the Judiciary, April 25, 1996). Thus, while the House and Senate negotiators chose the House bill's language for this provision in the final 1996 Amendments, see Pub. L. No. 104-231, § 4, 110 Stat. at 3049, both committee reports are useful in interpreting § 552(a)(2)(D).

11

Finally, the courts have developed a test to determine what is an "agency record."  See, e.g., Judicial Watch, 726 F.3d at 216.  That test does not quite translate to this context, but it nevertheless suggests that FOIA's reference to "records" has a retrospective, rather than a prospective, focus.  The Supreme Court has instructed that "the term 'agency records' extends only to those documents that an agency both (1) 'create[s] or obtain[s],' and (2) 'control[s] . . . at the time the FOIA request [was] made.'"  Id. (quoting U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 144–45 (1989)).  Of course, an agency cannot either have created or obtained information that does not yet exist.  Nor can the agency have control over information that had not been created at the time of the reactive FOIA request that serves as prerequisite for the reading-room provision.  Hence, as a matter of doctrine as well as of statutory interpretation, the Administrator's future calendar is not a "record" subject to FOIA's reading-room provision.

Against all this, plaintiffs offer two main responses, neither of which is persuasive.  First, they argue that the Administrator's detailed calendar qualifies as a single "record" under FOIA because it is a "continuously updated, non-static" document.  Reply in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Reply") [ECF No. 27] at 13.  Therefore, plaintiffs say, it does not matter that the calendar has been "updated and released" only "in piecemeal fashion until this point."  Id. at 11.

The central thrust of plaintiffs' argument is the implication that the Administrator's past and future calendar is one record that is merely "update[ed] or alter[ed]" by adding each new day's meetings.  Id.  Plaintiffs cite Yeager v. Drug Enforcement Administration, 678 F.2d 315 (D.C. Cir. 1982), for the proposition that "updating or altering a record does not convert it into a 'new record' for purposes of FOIA."  Pls.' Reply at 11.  But Yeager was not so broad.  That decision merely rejected "[t]he argument that a document with some information deleted is a 'new document,' and therefore not subject to disclosure."  Yeager, 678 F.2d at 321.  It rejected this argument in the

12

context of determining the scope of an agency's "duty to segregate and release nonexempt material," id. at 320, and cited a case that itself dealt with the segregation duty, see Long v. IRS, 596 F.2d 362, 366 (9th Cir. 1979). FOIA couches this requirement in terms of "deletion" of information, 5 U.S.C. § 552(b)—hence Yeager's language—but courts more commonly speak of it in terms of "redact[ion]," Am. Immigration Lawyers Ass'n (AILA) v. Exec. Office for Immigration Review, 830 F.3d 667, 677 (D.C. Cir. 2016). And there is a fundamental difference between redacting information from an extant document and creating new information that did not exist when a FOIA request was made. As noted, the former is often required under FOIA's mandate "to provide 'any reasonably segregable,' non-exempt portion of an existing record." Students Against Genocide v. Dep't of State, 257 F.3d 828, 837 (D.C. Cir. 2001) (quoting 5 U.S.C. § 552(b)). It would defeat the purpose of the segregability requirement if following FOIA's directions removed a record from FOIA's ambit. But the statute contains no such mandate to create new information to satisfy a request. See id. While adding to an existing record does not negate an agency's duty to release a prior, requested version, neither does it obligate an agency to disclose the new, never-sought version to an earlier requester—or proactively to publish it.

Plaintiffs also claim that "the D.C. Circuit has previously assumed that an agency administrator's electronic calendar is a single agency record for purposes of FOIA." Pls.' Reply at 12 n.2. True enough. As plaintiffs point out, in Consumer Federation of America v. Department of Agriculture, 455 F.3d at 293, the court found "that the electronic calendar of [an agency official] is not an 'agency record,'" id. at 293 (emphasis added). The Consumer Federation case, though, did not concern the reading-room provision; the plaintiff had asked only for reactive disclosure of officials' preexisting electronic calendars. Id. at 285. The court was hardly focused on whether

13

labeling an electronic calendar a singular "agency record" would subject the Department of Agriculture to rolling disclosure of future entries.

Indeed, the D.C. Circuit has treated individual annual paper calendars, and individual "daily agendas" that a secretary distributed each day to inform agency staff of her boss's schedule, as separate documents for the purposes of determining whether they were "agency records." See Bureau of Nat. Affairs, 742 F.2d at 1487–88, 1495–96. The Circuit has also referred to other non-static, electronically stored entries as separate "records" for FOIA purposes. See, e.g., Judicial Watch, 726 F.3d at 231 (finding that "[White House Access Control System] records disclosing visitors to the Office of the President are not 'agency records'"). The reason for this ad hoc treatment is that "agencies . . . in effect define a 'record' when they undertake the process of identifying records that are responsive to a request." AILA, 830 F.3d at 678. Though courts will not adhere to agencies' definitions if they fall outside "any reasonable understanding of a 'record,'" there is otherwise a "range of possible ways" in which agencies may decide what a "record" is. Id. at 678–79. The dividing lines that agencies have drawn in responding to prior requests do not dictate whether nonexistent information forms part of a single "record" with extant information.

Second, plaintiffs contend that their reading of the statute best fulfills Congress's desire to promote "efficient access" to government information. Pls.' Reply at 13–14. "Congress enacted the FOIA in order to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting Dep't of Air Force v. Rose, 495 U.S. 352, 361 (1976)). That a statute has an overarching intent, however, does not mean that "whatever furthers the statute's primary objective must be the law." Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund, 138 S. Ct. 1061, 1073 (2018). Regardless, interpreting the reading-room provision in the manner plaintiffs prefer would not best fulfill Congress's purpose.

As plaintiffs themselves recognize, the intent behind the reading-room provision is not just "access," but "efficient access." Plaintiffs argue that the phrase "records . . . that have been released" in § 552(a)(2)(D) should be read to include "the EPA Administrator's detailed calendar" because this reading would "streamlin[e] public access to those records" in the face of a recent glut of requests for Pruitt's calendar entries. Pls.' Reply at 15. But more disclosure does not always equal more efficient disclosure. One of Congress's purposes in enacting the 1996 Amendments, which created § 552(a)(2)(D), was to "enable agencies to more efficiently use their limited resources to complete [FOIA] requests on time." H.R. Rep. No. 104-795, at 12–13, 1996 U.S.C.C.A.N. at 3455–56. Yet plaintiffs' reading of § 552(a)(2)(D) would create massive, ongoing duties to publish non-static records if any part or prior version of a record had met the provision's prerequisites. Sticking with the example of a calendar, an agency might be required to publish an office's calendar on a rolling basis if, over several years, three people requested one day's worth of entries each. Or even upon the first request for any entry in the calendar, if the agency determined that other requesters would likely seek that or any other entry. The same might hold true of other non-static records, from email chains to Google Docs to White House access logs.

Nor does this duty have any natural stopping point. In arguing that the detailed calendar they seek has previously been released, as required by the reading-room provision, plaintiffs note that EPA "has released the Administrator's Calendar pursuant to FOIA under previous administrations." Pls.' Mot. at 11. If release of an agency head's calendar under a prior administration suffices to trigger rolling disclosure of the current agency head's calendar, then a mere three requests for certain entries would necessitate decades of effort on the agency's part. Popular interest in a non-static document like a calendar at one time could saddle an agency with

15

responsibility to publish every update even when there would otherwise be no interest in or request for those updates at a later time. This is not the sort of efficient access that Congress envisioned.

At oral argument, plaintiffs attempted to draw numerous distinctions: between electronic calendars and certain other non-static documents; between requests for targeted sets of calendar dates and more general calendar requests; and between Pruitt's calendar and other Administrators' calendars, if different Administrators are given different user accounts. This sort of parsing raises more concerns than it resolves. For one thing, agencies and courts would be required to engage in fact-intensive analyses of the particular technology used to create the record(s). This would eliminate much of the efficiency advantage that might otherwise be gained by making future changes to an existing record subject to publication under § 552(a)(2)(D). For another thing, the reading-room provision would become subject to manipulation. EPA could, for instance, create new user accounts for the same Administrator each month so that each month's entries would constitute a new record. And, most importantly, FOIA itself mandates none of this line-drawing. Plaintiffs suggest, for example, that editing and overwriting a document might not render the archived and new versions separate records. However, if one created a new document with a new name, rather than overwriting the same one, it would undoubtedly constitute a new record. Nowhere does FOIA state that the reading-room provision can be toggled on and off by pressing "Save" versus "Save As."

Plaintiffs point out that if the reading-room provision is not read to require affirmative disclosure of the Administrator's calendar, repeat requesters like them will be forced to file regular FOIA requests. See Pls.' Mot. at 15; Pls.' Reply at 16. Congress, they assume, could not have intended to require such a cumbersome process for both requester and agency. See Pls.' Mot. at 15–16; Pls.' Reply at 15–16. But "such anomalies often arise from statutes, if for no other reason

than that Congress typically legislates by parts—addressing one thing without examining all others that might merit comparable treatment." Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024, 2033 (2014). If plaintiffs think the reading-room provision's standards should be different, their argument is best directed to Congress. The New York Times certainly has a prominent position from which to do its convincing. And Congress has shown itself willing to tinker significantly with FOIA over the years. Indeed, it last did so only two years ago. Thus, telling plaintiffs to "take their objections across the street," Kimble v. Marvel Entm't, LLC, 135 S. Ct. 2401, 2409 (2015)—or up the Hill, in this Court's case—is not hollow advice.

Hence, for all of these reasons, Claim One of plaintiffs' complaint will be dismissed. Plaintiffs also seek injunctive relief, requiring EPA regularly to provide updated versions of Pruitt's calendar to plaintiffs until Pruitt leaves office. See Compl. ¶ 18(b), Prayer for Relief ¶ 3; Pls.' Mot. at 9, 13. Pruitt has now resigned, but EPA has not yet released these documents, so the issue remains live. However, the injunction is requested as a remedy for EPA's alleged violation of the reading-room provision. See Compl., Prayer for Relief ¶ 3; Pls.' Mot. at 9, 13, 17; Pls.' Reply at 19–21. Since the reading-room provision has not been violated, no relief is necessary.

## CONCLUSION

This Circuit has recognized that delayed disclosure under FOIA, often after protracted litigation, "provides scant comfort when stale information is of little value yet more costly than fresh information ought to be." Payne Enters., Inc. v. United States, 837 F.2d 486, 494 (D.C. Cir. 1988). Given the strong interest many organizations have shown in the Administrator's daily calendar, EPA would do well to consider adopting a more proactive stance and releasing the calendar on a rolling basis. But FOIA does not require EPA to publish any calendar entries under § 552(a)(2)(D) until that provision's prerequisites have been met. And those prerequisites are not

met when the information sought has not yet been created. Therefore, the Court will deny plaintiffs' partial motion for summary judgment and grant EPA's partial motion for summary judgment on Claim One. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 10, 2018